IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANDRES RIVERA, as parent and next
friend of A.R., a minor,

      Plaintiff,

v.                                                                    Civ. No. 13-00397 KG/KBM

VOLVO CARS OF NORTH AMERICA, LLC,
a Delaware Corporation,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendant's Combined Rule 50 and Rule 59

Motion (Motion), filed September 24, 2015.  (Doc. 460).  On October 6, 2015, Plaintiff

responded and Defendant replied on October 23, 2015.  (Docs. 465 and 471).  On December 15,

2015, this Court ordered supplemental briefing.  (Doc. 482).  On December 22, 2015, Plaintiff

filed a supplemental response[1] and Defendant field a supplemental reply on January 4, 2016.

---

[1]  On December 15, 2015, this Court ordered Plaintiff to "file a supplemental brief that cites with specificity to the trial transcript, trial exhibits, and/or supporting authority."  (Doc. 482) at 2.  The Court further directed Plaintiff that the supplemental brief "may not include new or additional arguments."  *Id.*  The Court finds that the following portions of Plaintiff's supplemental brief are stricken in violation of this Court's Order prohibiting new or additional arguments and, therefore, the assertions were not considered in the Court's analysis.

- "In fact, even NHTSA agreed that the subject switch was poorly designed.  Doc. No. 456 (excerpt attached hereto as Exhibit C) at 179"17–180:10."  (Doc. 487) at 2.

- . . . "and that parents' lives are busy and hectic." *Id.*

- "It was an undisputed, recognized risk, and recognized risks (foreseeable risks) are the ones which must be designed out when it is feasible to do so.  Doc. No. 437 (Exhibit E) at 1 (Plf No. 2 (Exhibit F)); Doc. No. 456 (Exhibit C) at 109:2–12, 110:22–111:6, 174:5–25, 176:5–9, 178:13–179:8, 179:17–180:10; Doc. No. 457 (Exhibit A) at 175:14–176:11, 208: 16–209:2; Doc. No. 483 (Exhibit D) at 22:12–23:17."  (Doc. 487) at 4.

- "There is no requirement that a particular risk be quantified.  What the jury instructions address is whether or not a risk is foreseeable.  *See* UJI 13–1403 NMRA.  Consequently, what Mr. Rosenbluth discussed was protection against recognized risks.  Doc. No. 456 (Exhibit C) at 178:13–17.  It was undisputed that

_____

entrapment was a recognized risk of power window switches which could be inadvertently actuated by a child's knee.  Doc. No. 456 (Exhibit C) at 179:3–8; Doc. No. 457 (Exhibit A) at 190:4–10, 264:15–22; Doc. No. 483 (Exhibit D) at 8:17–25, 9:24–10:7."  (Doc. 487) at 5.

- "Even Mr. Eugensson agreed with him that children accidentally activating switches with their knees was a recognized risk and that Volvo's recommendation of a test device design was to eliminate the risk.  Doc No. 484 (Exhibit B) at 14:10–15:8.  That was also consistent with the Alps Automatic Reverse System patent information which recognized that power window entrapment 'was a great danger for a family, including little children' as early as the mid-1980's.  In fact, that was the reason Volvo put warnings in the subject vehicle owner's manual [sic] not leave children unattended.  Doc. No. 483 (Exhibit D) at 10:8– 14:3.  However, even Mr. Eugensson did not know if the warning was intended by Volvo to warn parents of children's knees accidentally raising a window by pushing down on the button.  But he also agreed that the ball test was to evaluate for "switches that are not safe."  Doc. No. 484 (Exhibit B) at 11:9–20."  (Doc. 487) at 8.

- "This approach to design defect risks is the same approach Volvo takes as well.  Doc. No. 457 (Exhibit A) at 208:16–22."  (Doc. 487) at 9.

- "Even Mr. Andersson, Volvo's company representative of [sic] the issue of power windows, agreed that, even if he could use the subject window switch today, he would not do it.  Doc. No. 457 (Exhibit A) at 257:7–11."  (Doc. 487) at 10.

- "Similarly, it is like arguing that the expert in the *Bustos* opinion was no good because he only opined that the roof was defective because it caved in.  If the room had not caved in, there would never have been litigation over it.  Similarly here, if the evidence had been that the father raised the window, no one would have even looked at the front passenger window switch."  (Doc. 487) at 11.

- "As discussed more thoroughly below, everyone agreed that there were only two ways this accident could have happened.  Either A.R. raised the window with her hand or knee, or she asphyxiated on a stationary window.  So the most important inquiry is going to be whether the geometry is such that the child accidentally raising the window was likely."  (Doc. 487) at 12.

- . . . "and this is consistent with all of the medical literature discussed by each expert."  *Id.* at 15.

The Court also finds that although the following sections appear to be new or additional arguments, the sections are in fact substantially similar to Plaintiff's prior contentions and/or provide the necessary clarification to assist the Court in its analysis.  The following sections, therefore, are not stricken.

- "Mr. Rosenbluth discussed this history of the risk as well as his own testing, both of which served as adequate bases for his defect opinion.  He also went through numerous models of production switches which easily eliminated the risk.  An exemplar switch identical to the one in the subject vehicle was admitted so that the jury could touch and see that it is simply a switch that rocks back and forth depending on whether you apply the force down at the front of the switch or the rear of the switch."  (Doc. 487) at 4–5 (internal citations omitted).

- "Mr. Rosenbluth's evaluation of the risk of harm in this case was based not only on this single occurrence but also on an established history of power window switches which can be raised inadvertently when pushed down on by a child's knee causing serious injury or death."  *Id.* at 6.

- "Even Dr. Funk agreed that the presence or absence of a mark on the back of the neck was not determinative on the issue of how the accident occurred."  *Id.* (citation omitted).

(Docs. 487 and 492).  The Court having considered Defendant's motion, the parties' briefs, the trial transcript, the relevant law, and being otherwise fully informed, finds that Defendant's Motion should be denied, in part, and granted, in part, for the reasons set forth below.

I.    *Background*

This federal diversity personal injury lawsuit arises out of child entrapment in a 2001 Volvo S60 four-door sedan automatic power window that occurred in Santa Fe, New Mexico, on September 27, 2010.  Plaintiff's Second Amended Complaint alleged Defendant was liable in product liability negligence and strict products liability based on the subject window switch's defective manufacturing, design, and Defendant's failure-to-warn.  Plaintiff further contended A.R., Plaintiff's minor child, suffered a severe anoxic brain injury as a result of the entrapment and would require lifelong medical care and assistance with daily living.  Plaintiff sought compensatory and punitive damages.

On June 10, 2015, the Court granted partial summary judgment in favor of Defendant on Plaintiff's failure-to-warn claim.  (Doc. 318).  On July 1, 2015, the Court also ruled that Defendant was entitled to summary judgment on Plaintiff's product liability negligence claim. (Doc. 332).  On July 2, 2015, the Court further found that summary judgment was warranted in favor of Plaintiff as to Defendant's affirmative defense of A.R.'s comparative negligence and independent intervening cause; additionally, the Court concluded Plaintiff was not entitled to punitive damages. (Docs. 358 and 359).

This case was tried before a jury beginning on August 10, 2015.  On August 13, 2015, at

---

- "The problem is that it does not make any difference to Ms. Hoffman's opinion if on the critical event the window was raised from halfway up to two inches or from one-fourth up to two inches.  What matters is that due to the pressure on the neck, A.R.'s brain was deprived of oxygen, leading to the brain injury, which is undisputed."  *Id.* at 17.

- "Her head was found in the center of the window above the seat, not towards the front of the window over the floor."  *Id.* (citation omitted).

the close of Plaintiff's damages evidence, Defendant made two Fed. R. Civ. P. 50(a) motions for

judgment as a matter of law as to Plaintiff's comparative negligence and A.R.'s future lost

wages. (Doc. 455) at 120–27.  Then, on August 17, 2015, at the close of Plaintiff's case-in-chief,

Defendant made a timely Fed. R. Civ. P. 50(a) motion as to Plaintiff's strict product liability

claim.  (Doc. 456) at 286–88.  The motions were denied and the case was submitted to the jury

on August 19, 2015.  (Doc. 458) at 227:13.  On August 20, 2015, the jury returned a unanimous

Special Verdict finding (1) the 2001 Volvo S60 was defective; (2) the product defect was the

cause of Plaintiff's injuries and damages; and (3) that Plaintiff Andres Rivera was 30% at fault,

whereas Defendant was 70% at fault.  (Doc. 439).  The jury awarded Plaintiff $9,686,225.15 in

compensatory damages.  *Id.*  On August 27, 2015, the Court entered final judgment against the

Defendant in the amount of $6,780,357.61.  (Doc. 445).

II.    *Standards of Review*

    A.  *Judgment as a Matter of Law*

Fed. R. Civ. P. 50(b) states in pertinent part:

> If the court does not grant a motion for judgment as a matter of law made under
> Rule 50(a), the court is considered to have submitted the action to the jury
> subject to the court's later deciding the legal questions raised by the motion. . . .
> No later than 28 days after the entry of judgment—the movant may file a
> renewed motion . . . .  In ruling on the renewed motion, the court may:  (1) allow
> judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3)
> direct the entry of the judgment as a matter of law.

The Tenth Circuit has held that a party is entitled to judgment as a matter of law under Rule

50(b) only if there is no legally sufficient evidentiary basis for a claim under the controlling law.

*Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1216 (10th Cir. 2002).  In reviewing the record,

the Court "will not weigh evidence, judge witness credibility, or challenge the factual

conclusions of the jury."  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1099 (10th Cir.

2001).  Moreover, the Court will consider the evidence and any inferences drawn therefrom in favor of the non-movant.  *Snyder v. City of Moab*, 354 F.3d 1179, 1184 (10th Cir. 2003).

### B.  A New Trial

Alternatively, Defendant brings a motion for a new trial under Fed. R. Civ. P. 59(a), which provides that, after a jury trial, a court may grant a new trial on some or all of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "[T]he party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence."  *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir. 1983) (citation omitted).  In reviewing a motion for a new trial, the Court must view the evidence in the light most favorable to the non-moving party.  *Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir. 1993).

Whether to grant a new trial is a decision committed to the sound discretion of the district court.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  Motions for a new trial are generally disfavored and should only be granted with great caution.  *United States v. Mounkes*, 204 F.3d 1024, 1027–28 (10th Cir. 2000).

### C.  Alter or Amend Judgment

A party who seeks reconsideration of a judgment may file a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e).  *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991).  A Rule 59(e) motion to alter or amend the judgment must be filed with twenty-eight days after the judgment is entered.  Fed. R. Civ. P. 59(e).  The Tenth Circuit recognizes only certain grounds for granting a Rule 59(e) motion, including:  "(1) an intervening change in the controlling law; (2) new evidence previously unavailable; and (3) the need to correct clear error or prevent manifest injustice."  *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012

(10th Cir. 2000).  A Rule 59(e) motion is appropriate when "the court has misapprehended the facts, a party's position, or the controlling law."  *Id.*  Rule 59(e) motions, however, are inappropriate to re-litigate matters, advance new arguments, or present evidence that could have been raised prior to the entry of the judgment.  *Steele v. Young*, 11 F.3d 1518, 1520 n.1 (10th Cir. 1993).

III.    *Discussion*

Defendant asserts that the judgment against it is erroneous in several respects. Specifically, Defendant contends no competent evidence was adduced at trial to establish that: (1) the subject switch was defective; (2) the subject switch was a cause of A.R.'s injuries; (3) Plaintiff met his burden of proof with respect to A.R.'s lost earning capacity; and (4) Mr. Rivera was "anything less than 100% at fault."  (Doc. 460) at 2.  Defendant also argues that the trial testimony from Gerald Rosenbluth (Rosenbluth), Plaintiff's automotive product design expert, and Michelle Hoffman (Hoffman), Plaintiff's biomechanical engineer expert on causation, was inadmissible under *Daubert* and its progeny and must be determined so at this time.  Defendant further asserts that Plaintiff's defect and causation evidence rested entirely on the opinions of Rosenbluth and Hoffman.  Plaintiff disputes each contention.

A.   *The Verdict was Supported by Sufficient Evidence of Defect and Rosenbluth's Testimony was Admissible*

Defendant first claims Rosenbluth's testimony was improper because it runs afoul to New Mexico law.  More particularly, Rosenbluth applied an "incident-specific-causation" approach— that the subject switch created an unnecessary risk under the circumstances opined by Hoffman—rather than evaluating and opining on the "unreasonableness" of the risk presented by the subject switch.

The jury was instructed that in order to find the subject switch defective the subject

switch must present an "unreasonable risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable.  This means that a product does not present an unreasonable risk of injury simply because it is possible to be harmed by it."  (Doc. 438) at 9 (citing UJI 13-1407 NMRA 2005).

In this case, Plaintiff presented substantial evidence to the jury regarding Rosenbluth's methodology to determine whether the subject switch presented an "unreasonable risk of injury." More importantly, Rosenbluth's conclusions were specifically related to the facts and circumstantial evidence in this case as mandated by Fed. R. Evid. 702, *Daubert* and its progeny. *See, e.g., Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (expert opinions must be reliable under *Daubert*); *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (expert opinion must be based on sufficient facts); *Bustos v. Hyundai Motor Co.*, 2010-NMCA-090 ¶ 24, 149 N.M. 1, 6–7 (finding expert's opinion product defective "specifically related to his investigation" and, thus, admissible); *see also* Fed. R. Evid. 702.

At trial, Rosenbluth testified that Plaintiff hired him to evaluate the subject vehicle and "the system to find out how and why [A.R. was asphyxiated] and if there was a defective product."  (Doc. 456) at 39:6–8.  Rosenbluth then reviewed the police report, police photographs, witness statements, examined the subject vehicle, and examined exemplar switches.  *Id.* at 39:11–15, 40:15–17.  In particular, Rosenbluth testified that he conducted a power window functional analysis on an exemplar vehicle, including, but not limited to the window switch system in automatic mode and manual mode.  *Id.* at 43–57.  Rosenbluth further testified that in auto up mode the exemplar window will continue to rise "unless there is a pinch point."  *Id.* at 44:15–18.  And, once the window encounters an obstruction it immediately auto reverses.  *Id.* at 46:1–13.  On the other hand, when operating in manual mode, the exemplar window will not

7

auto reverse when it encounters an obstacle.  *Id.* at 48:8–24.

      Next, Rosenbluth conducted a 40-millimeter ball test—the National Highway Traffic Safety Administration (NHTSA) and industry standard for replicating a child's knee—on the exemplar window switch system.  *Id.* at 51:17–54:19.  Rosenbluth testified that the 40-millimeter ball gauge actuated the window by applying pressure to the back of the window switch.  *Id.* at 54:24–55:5.  Rosenbluth specifically administered the test in auto up mode, manual mode, and auto up override mode.  *Id.* at 55:6–56:18.  In the auto up override mode, the ball gauge applied "maximum authority to the back of the switch" overriding the auto reverse function.  *Id.* 56:14–18.  Rosenbluth then testified that the gauge applied approximately between one and one half pounds and three pounds of force when actuating the switch in manual mode and auto up override mode respectively.  *Id.*at 56:24–57:16.

      Moreover, Rosenbluth testified about the history of inadvertent window actuation and, specifically, the risk of serious injuries or death to children.  *Id.* at 174:5–25, 176:5–13.  In fact, Plaintiff presented evidence that although NHTSA never explicitly identified the subject switch, NHTSA addressed concerns regarding "poorly designed pull-up switches."  *Id.* at 179:17–24.  In his testimony, Rosenbluth opined that the location of the fulcrum—otherwise known as a pivot point—in the middle of the subject switch created a "seesaw" effect actuating the window from either the front or the back of the switch.  *Id.* at 55:21–23, 57:22–23; 58:1–10, 64:12–65:14.  Based on the foregoing, Rosenbluth surmised that the performance of the switch—actuating by pressing on the back of the switch—rendered it defective because it created an "unnecessary risk."  *Id.* at 55:21–23, 57:22–23; 58:1–10.  Furthermore, such a design fell within the "poorly designed pull-up switches" addressed by NHTSA.  *Id.* at 179:25–180:10.  Accordingly, Rosenbluth opined that the subject window system was "defective and unreasonably dangerous

and had a considerable risk of injury involved, and that was an unacceptable risk of injury level, which was very easily remedied or eliminated from the system by a simple design process." *Id.* at 41:1–7. From this evidence, a reasonable jury could infer that the subject switch, under these circumstances, functioned in a manner that created an "unreasonable risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable." *See* UJI 13-1407 NMRA 2005.

Defendant next asserts that Plaintiff presented insufficient evidence with respect to defect because Rosenbluth failed to discuss the seven risk-benefit criteria enumerated in UJI Civ. 13–1407 Committee's Commentary. Defendant's assertion lacks merit. The Committee Commentary explicitly states that UJI 13-1407 does not provide "criteria for determining whether a risk of injury is unreasonable" because "this falls within the unique domain of advocacy under the circumstances of proof in each case." UJI 13-1407 NMRA 2005 Committee Commentary. Notably, UJI 13-1407 articulates two of the Wade Factors; specifically, whether a reasonably prudent person would find the risk unacceptable and "the ability to eliminate the risk without seriously impairing the usefulness of the product or making unduly expensive." UJI 13-1407 NMRA 2005.

Here, Plaintiff presented sufficient evidence regarding the two Wade Factors in UJI 13-1407. First, Rosenbluth repeatedly testified about the likelihood of injury and its probable seriousness based on the performance of the subject window system. *See supra.* Second, Thomas Andersson (Andersson), Volvo Car Corporation's representative, testified with respect to feasible alternative designs. Andersson first testified that older Volvo models utilized either center console mounted switches or switch designs with the fulcrum at the rear of the switch. (Doc. 457) at 252:15–254:3. And, both designs eliminated the risk of inadvertent actuation. *Id.*

With respect to the subject switch, Andersson testified that Volvo added a rib to the plastic bezel surrounding the switch in order to comply with the 2008 NHTSA requirements. *Id.* at 246:6–13. The cost of the raised bezel was nominal:  more than a penny, but less than a dollar.  (Doc. 483) at 33:20–34:1.

Rosenbluth then meticulously testified about feasible alternative window systems, switch designs, and features that would eliminate the unreasonable risk of injury.  (Doc. 456) at 62:23– 70:13 (exemplar switch with and without bezel trim), 70:14–76:9 (redesign fulcrum point, [2] switch cover, and economic feasibility), 76:14– 80:18 (alternative power window system auto reverses in manual mode), 80:19–81:3 (horizontal versus vertical mounting), 82:16–84:9 (proximity of window switch), 85:4– 89:8 (child lockout feature).  Viewing this evidence and all inferences in favor of Plaintiff, a reasonable jury could conclude that the risk of injury was unreasonable and feasible alternative designs were available.

Defendant further claims Rosenbluth's testimony is insufficient because he "did not consider what is customarily done by other manufacturers, and what [other manufacturers] did with the knowledge possessed by the industry."  (Doc. 460) at 6.  In New Mexico, evidence the jury may consider to determine whether a risk of injury is acceptable to a reasonably prudent person includes "what is customarily done by those engaged in the supplier's business," "the conduct of a reasonably prudent person having full knowledge of the risk," as well as "[c]ompliance with industry customs, standards, rules, or governmental rules or standards." (Doc. 438) at 10 (citing UJI 13-1408 NMRA 1997).

In this matter, it is undisputed that the subject vehicle complied with all federal safety

---

[2]  It is noteworthy that Dr. James Salmon (Dr. Salmon), Defendant's automotive product design expert, testified that Rosenbluth's redesign of the fulcrum point was a not a feasible alternative design because the placement would eliminate the switch's functionality.  Nonetheless, as discussed in greater detail *infra*, it is within the purview of the jury—not the Court— to weigh contradictory expert testimony.

standards. (Doc. 456) at 102:14–16. The parties, however, presented conflicting evidence regarding industry design features in 2001MY. Dr. Salmon completed a 2001MY power window system survey and opined that the subject vehicle fell within the industry customs. *See* Trial Ex. N. Rosenbluth also conducted a benchmark survey and testified that it supported his opinions in this case. (Doc. 456) at 117:20–25; 172:19–173:3. It is the province of the jury to weigh the contradictory evidence, inferences, and to judge the credibility of the expert witnesses. *See Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944). In doing so, a reasonable jury could find one expert more credible than the opinions of another. The Court, therefore, will not set aside the jury verdict because the jury could have found Dr. Salmon's opinions more credible.

Defendant's final contention is that Rosenbluth's testimony was inadmissible because he admitted that his primary alternative design—the 2000 Volkswagen Passat—was defective under an alternative theory, but presented itself as non-defective under Hoffman's causation theory. Defendant's argument ignores the fundamental principles of *Daubert*. An expert's opinion is admissible if it is based on reliable methodology and sufficient facts of the case. *See, e.g., Ralston*, 275 F.3d at 969; *Kieffer*, 90 F.3d at 1499; *Bustos*, 2010-NMCA-090 ¶ 24, 149 N.M. at 6–7; *see also* Fed. R. Evid. 702. As previously determined by this Court, Rosenbluth's methodology was reliable and his opinions were sufficiently based on the circumstantial evidence presented in this matter and, therefore, admissible. *See* (Doc. 321). Furthermore, Rosenbluth was not required to opine on an alternative theory in which there was no evidence to support. *See* Fed. R. Evid. 702. Likewise, any weaknesses in the underpinnings of Rosenbluth's opinions go to weight and not admissibility. *See Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, 1518 (10th Cir. 1996), *overruled on other grounds by Kumho Tire Co. Ltd. v. Carmichael*, 526

11

U.S. 137, 147 (1999) (stating that if there is logical basis for expert's opinion, weaknesses in underpinnings of opinion go to weight and not admissibility); *see also Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  The amount of weight to afford Rosenbluth's testimony is the sole purview of the jury—not this Court.  *See Tennant*, 321 U.S. at 35.  Thus, the admission of Rosenbluth's testimony did not constitute clear error or result in manifest injustice.

Viewing the aforementioned evidence and all inferences in the light most favorable to Plaintiff, the Court finds there is substantial evidence in the record to support the jury's defect verdict.  Consequently, Defendant is not entitled to judgment as a matter of law.  The Court further finds that Rosenbluth's testimony was admissible according to *Daubert* and its progeny and, therefore, the Court concludes no manifest injustice or prejudicial error resulted from the admission of the testimony.  Rosenbluth's opinions were based on sufficient facts and data that enabled him to express reasonably accurate conclusions based on the facts and circumstantial evidence in this case; absolute certainty was not required.  Accordingly, Defendant's motion is denied.

   B.  *Hoffman's Testimony was Admissible and, Therefore, the Verdict was Supported by Sufficient Evidence of Causation*

Defendant first asserts that Hoffman's testimony is inadmissible under *Daubert* because her opinion is not based on an objective analysis of the possible scenarios.  Rather, Hoffman's opinion stems from counsel's directive that an inadvertent actuation occurred.  Defendant's assertion relies, in part, on Hoffman's testimony that it was "assumed" that an actuation transpired.  (Doc. 460) at 11.  Furthermore, Hoffman's opinion is based on limited

circumstantial evidence.

Under New Mexico products liability law, causation elements "may be established by circumstantial evidence." *Martin v. Unit Rig & Equip. Co., Inc.*, 715 F.2d 1434, 1439 (10th Cir. 1983) (citing *Richards v. Upjohn Co.*, 95 N.M. 675, 678, 625 P.2d 1192, 1195 (N.M. Ct. App. 1980)). In addition, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. *See* Fed. R. Evid. 702, 703; *Daubert*, 509 U.S. at 592. An expert, however, is not permitted to speculate. *Goebel v. Denver & Rio Grande Western R.R. Co*., 215 F.3d 1083, 1088 (10th Cir. 2000). An expert opinion must be based on facts that enable the expert "to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required." *Kieffer v. Weston Land, Inc.*, 90 F.3d at 1499 (citation omitted); *see also Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1089–90 (10th Cir.1994) (when expert's opinion had some basis in fact, jury could determine whether testimony was helpful).

At trial, Hoffman testified that Plaintiff's counsel asked her to analyze and determine how a child could entrap herself with a power window. (Doc. 454) at 152:18–23. Hoffman further testified that it was "assumed" from the beginning that the window inadvertently actuated. *Id.* at 180:20–21. Hoffman, nonetheless, reviewed all pertinent documentation including A.R.'s medical records, police report, photographs, and all available depositions. *Id.* at 153:1–5. After her review of the aforementioned—including documentation imitating that Andres Rivera, A.R.'s father, accidentally raised the window—Hoffman concluded that the inadvertent actuation of the subject switch was the cause of A.R.'s injuries. *Id.* at 158:17– 159:17, 180:10–12, 21–23, 182:15–17, 194:5–9. Based on her initial conclusion, Hoffman then conducted a computer-generated surrogate model test in various positions to determine how A.R.

could have actuated the window switch.  *Id.* at 169:6–172:15.  Hoffman also testified that she

conducted a 40-millimeter ball test on an exemplar switch.  *Id.* at 164:23–165:6.  During that

particular test, the exemplar switch inadvertently actuated with a peak force of 3.8 pounds.  *Id.* at

165:7–14.  Next, Hoffman testified that she conducted live surrogate testing "to get the

geometrical relationship" of A.R.'s body and limbs to the exemplar window system.  *Id.* at

172:16–173:16.  Considering all of her testing, Hoffman opined that A.R.'s knee most likely

inadvertently actuated the switch.  *Id.* at 172:13–15, 174:1–16.  Hoffman further testified that

she analyzed Dr. Funk's theory that A.R. accidentally hung herself from the subject window.  *Id.*

at 194:17–19.  Her analysis determined that Dr. Funk's theory was inconsistent with the facts

and circumstantial evidence in the case.  *Id.* at 174:5–20, 194:17–19.

In light of this testimony, the Court finds that Hoffman sufficiently formed her opinions

regarding the inadvertent actuation of the window switch on the basis of the circumstantial

evidence.  Her opinions were not unsupported.  Moreover, the Court finds that Hoffman's

testimony sufficiently tied her methodology to the facts and circumstantial evidence in this case

and, hence, was admissible.  For example, Hoffman's testimony is derived from reliable

principles and methods because she utilized live and computer-generated surrogate testing,

which could be tested by opposing counsel.  *See Daubert*, 509 U.S. at 593 (expert theory might

be scientifically valid if it can or has been tested).   And, Hoffman's methodology included the

40-millimeter ball test— NHTSA and industry standard for replicating a child's knee.  *See id.*

(expert theory might be scientifically valid if subjected to peer review and publication or general

acceptance).  Furthermore, any inadequacies in Hoffman's testimony regarding alternative

causes or failure to investigate alternative causes went only to the weight of her causation

opinion and have no bearing on its admissibility.  *See, e.g., McDonald v. N. Am. Specialty Ins.*

*Co.*, 224 Fed. Appx. 761 (10th Cir. 2007); *Goebel v. Denver and Rio Grande Western R.R. Co.*, 346 F.3d 987, 998–99 (10th Cir. 2003).

Next, Defendant claims Hoffman's methodology was unreliable because the bases of Hoffman's opinions—A.R.'s medical records and literature on actuation—are riddled with speculation and are not substantially similar to the incident, respectively. Moreover, Hoffman failed to conduct an injury analysis, a requisite for causation opinions according to Defendant. Defendant also maintains that unlike its biomechanical engineer expert on causation, Dr. James Funk (Dr. Funk), Hoffman did not test her theory with an actual child and, therefore, her opinion is unreliable for lack of sufficient testing.

As an initial matter, the Court finds Defendant's contentions that Hoffman relied upon "speculative or baseless" statements within A.R.'s medical records and that Hoffman failed to conduct an injury analysis are untimely. In its *Daubert* motion to exclude Hoffman, Defendant did not assert either contention. *See* (Doc. 244). In addition, Defendant did not timely object at trial. Therefore, the Court concludes Defendant waived any objection to these bases of Hoffman's opinions. *See* Fed. R. Evid. 103(a).

The Court further finds Defendant's contention that Hoffman's opinions are unreliable because her scientific literature does not directly address or support her opinions lacks merit for two reasons. First, as this Court has previously ruled, "familiarity with scientific literature on actuation of back window switches is not a prerequisite to opine on causation. Rather, expert testimony is admissible if it is based on reliable and scientifically valid methodology that fits within the facts of the case." (Doc. 307) at 10 (citing Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93). As addressed *supra*, Hoffman's opinions were based on sufficient facts and data and she applied her methodology specifically to the facts of this case. Second, Hoffman's failure to

15

review scientific literature that is substantially similar to this case goes to the weight that the jury afforded her testimony and not its admissibility.  *See Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 654 (10th Cir. 1991) ("[T]he sufficiency of factual basis to support [the expert's] opinion go to its weight, and not its admissibility."); *see also Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) ("[T]he weaknesses in the data upon which [the] expert relied go to the weight the jury should [give the expert's] opinion, they do not render [the expert's] testimony too speculative as a matter of law.")

Likewise, Hoffman's failure to test her theory with an actual child's knee is not necessary to establish reliability under *Daubert*.  "[A]n expert's 'personal experience, training, method of observation, and deductive reasoning' could be sufficiently reliable to constitute valid methodology."  *Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1252, 1270 (D.N.M. 2005) (citing *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1122 (10th Cir. 2004)); *see also Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Here, Hoffman conducted several tests including live and computer-generated surrogate tests and the 40-millimeter ball test to determine if and how A.R. actuated the subject switch.  Thus, the Court finds that Hoffman's observations and deductive reasoning, based on her extensive testing, were sufficiently reliable to constitute as valid and, accordingly, admissible methodology.

Finally, Defendant argues Hoffman's opinions are unreliable because she did not test the minimal force necessary to actuate the window switch, nor did she opine as to how much force A.R. actually applied or the duration thereof.  As discussed, testing is not necessary in all instances in order to establish reliability under *Daubert.  See Morales*, 382 F. Supp. 2d at 1270

16

(citation omitted); *see also Daubert,* 509 U.S. at 596.  In this matter, Hoffman testified that the lowest force necessary to actuate the switch was 3.2 pounds.  (Doc. 454) at 208:15–16.  Hoffman further testified that her analysis with the 40-millimeter ball demonstrated that the switch could actuate at forces greater than 3.2 pounds.  *Id.* at 164:23–165:14, 168:10–19.  Hoffman then deduced that because A.R. weighed between twenty-four and thirty pounds at the time of the incident that she could have applied the minimal necessary force to actuate the switch.  *Id.* at 230:5–231:19.  Indeed, Hoffman further explained that she surmised that A.R. exerted enough force to inadvertently actuate the window switch in manual mode because the window did not auto reverse.  *See id.*  The Court finds Hoffman's deductive reasoning that A.R. exerted the necessary degree and duration of force to raise the subject window in manual mode sufficiently reliable as applied to Hoffman's observations and the circumstantial evidence in this case.  Any weaknesses in Hoffman's methodology go to the weight of the testimony, not its admissibility.

In sum, the Court finds Hoffman's testimony was admissible pursuant to Fed. R. Evid. 702 and *Daubert.*  In reviewing the sufficiency of the evidence to support the verdict for Plaintiff, the Court must resolve all conflicts against Defendant and award Plaintiff the benefit of such favorable inferences as the jury might reasonably have drawn.  Thus, viewing Hoffman's testimony and all evidence and inferences in the light most favorable to Plaintiff, the Court also finds there is sufficient evidence in the record to support the jury's verdict on causation. Defendant's motion for judgment as a matter of law is denied accordingly.  The Court also finds that the admission of Hoffman's testimony was not clearly erroneous nor a result of manifest injustice.  In addition, viewing the evidence in the light most favorable to Plaintiff the Court finds the verdict was based on substantial evidence and the admission of Hoffman's testimony did not constitute prejudicial error.  Defendant's motion is denied accordingly.

C. *There Was No Legally Sufficient Evidentiary Basis on Which a Reasonable Jury Could Award $1,000,000 in Future Lost Wages*

Defendant contends that judgment as a matter of law is warranted because no reasonable jury could award $1,000,000 in future lost wages based on the sufficiency of the evidence. Defendant maintains that the record is void of any testimony or evidence instructing the jury how to reduce future lost wages to present value as required by UJI 13-1809.  Moreover, Defendant claims there is no evidence as to an applicable discount rate.

Plaintiff, in response, contends that Plaintiff's economist, Robert Johnson (Johnson), sufficiently testified as to present value, including, multiple variables necessary to calculate present value with reasonable certainty.  Plaintiff next asserts that Johnson testified as to the discount rate.  Specifically, Johnson described discount rate as "the difference between the interest rate, called the rate of return, and whatever we're comparing it to, regular inflation . . . ." (Doc. 465-11) at 2.  Finally, Plaintiff argues that the New Mexico Supreme Court rejected a formulaic approach to calculating future earning capacity and, instead, held that loss of earning capacity depends on probabilities and numerous factors.

"In assessing damages for loss of future earning capacity, the trier of fact must reduce a lump sum award to its present value."  *Hoskie v. United States*, 666 F.2d 1353, 1355 (10th Cir. 1981) (citing *Chesapeake & Ohio Ry. v. Kelly*, 241 U.S. 485, 489–91 (1916)).  In other words, the trier of fact must "calculate an amount of money that can be invested in a reasonably safe long-term investment available to the average person, which ultimately will yield a sum equal to plaintiff's lost income over the span of his working life expectancy."  *Id.*  Although this may be a difficult mathematical computation, expert testimony or evidence of "the standard interest and annuity tables in which present values are worked out at various rates of interest and for various periods covering the ordinary expectancies of life" may assist the trier of fact.  *Chesapeake*, 241

18

U.S. at 491.  The proper evidence for present value, however, "is to be determined according to the law of the forum."  *Id.*

New Mexico law defines a minor's loss earning capacity as "[t]he present cash value of earning capacity reasonably certain to be lost in the future after the plaintiff has reached the age of eighteen (18) years."  UJI 13-1809 NMRA 2015.  It is well established that an injured person's earning capacity may be evidenced by age, life expectancy, intelligence, ability, habits, occupation, health and probable increase in skill.  *Turrietta v. Wyche*, 1949–NMSC–067 ¶ 23, 212 P.2d 1041, 1047.

A review of the record indicates that the following evidence was admitted at trial with respect to A.R.'s earning capacity.  David Joseph Callahan, M.D. (Dr. Callahan), A.R.'s pediatric neurology expert, testified that due to A.R.'s cognitive deficiencies she would not be financially independent because she could not "obtain a job and work independently."  (Doc. 453) at 38: 21–23, 39:4–5.  Yet, Dr. Callahan alluded that A.R. could enter a post-high school vocational program earning "a couple dollars an hour."  *Id.* at 39:15–16.  Plaintiff maintains that A.R.'s school records, medical and therapy records, and family vocational history were also admitted into evidence.  Plaintiff, however, has not provided the Court with any citations to the record to facilitate the Court's analysis.  The District of New Mexico Local Rules of Civil Procedure mandates that a party "must submit evidence . . . in support of allegations of fact."  D.N.M.LR-Civ. 7.3(b).  Nevertheless, an examination of the trial exhibit list indicates that A.R.'s school, medical, and therapy records were admitted into evidence.  *See* (Doc. 437) at 12–13, 20.  Additionally, at the close of Plaintiff's case-in-chief, the Court took judicial notice that A.R. had a work life expectancy of 28.5 years; and, that minimum wage rates were $7.25/hour and $10.84/hour for the federal and Santa Fe, New Mexico, rates respectively.  (Doc. 458) at 146: 6–

15.

Based on the foregoing, the Court finds sufficient evidence for a reasonable jury to determine A.R.'s future earning capacity. *See Turrietta*, 1949–NMSC–067 ¶ 23, 212 P.2d at 1047 ("No general rule can be formulated that would properly control the admission of evidence to prove a man's future earning capacity. It must be arrived at largely from probabilities . . . ."). Moreover, the Court finds that the admission of the aforementioned evidence is not clearly erroneous and does not result in manifest injustice. The Court's analysis, however, does not end here.

New Mexico law mandates that an injured party's earning capacity must be capitalized to arrive at its present value. *Varney v. Taylor*, 1966–NMSC–080 ¶ 11, 419 P.2d 234, 238; UJI 13-1809 NMRA 2015. A plaintiff may demonstrate present value in various ways, including expert testimony computing present value, interest tables, or annuity tables that demonstrate present value of the injured party's earning capacity over a period of time, equal to the injured party's life expectancy. *See id* at ¶ 9, 419 P.2d at 237 (interest table); *Turrietta*, 1949–NMSC–067 ¶ 26, 212 P.2d at 1048 (annuity table); *Mares v. N.M. Pub. Serv. Co.*, 1938–NMSC–032 ¶ 64, 82 P.2d 257, 271 (annuity table), *overruled by on other grounds Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999–NMSC–006, 976 P.2d 1; *Wilson v. Wylie*, 1973–NMCA–154 ¶ 21, 518 P.2d 1213, 1219 (expert testimony). The New Mexico Supreme Court also advises that the "[d]iscount rate should be based upon investments in safe securities, or upon the cost of an annuity." *Mares v. N.M. Pub. Serv. Co.*, 1938–NMSC–032 ¶ 64, 82 P.2d at 271.

Here, Plaintiff contends Johnson sufficiently testified as to present value and discount rate in order for the jury to reasonably determine A.R.'s future lost wages. The Court finds Plaintiff's contention mystifying in light of this Court's June 18, 2015, Memorandum Opinion

and Order excluding Johnson's future lost wages testimony. *See* (Doc. 315); *see also* (Doc. 453)

at 208:5–12. In addition, a close examination of Johnson's testimony reveals that he testified in

generalities of present value and discount rate. For example, Johnson explained present value as,

> [T]o an economist in a litigation setting, has a very specific meaning. It's how much money needs to be set aside today to replace what will be incurred in the future, accounting for inflation, but also accounting for the fact that we understand the dollar today doesn't have the purchasing powers it did ten years ago. So we're going to have inflation. Then, on top of regular inflation, we've got medical inflation, which is even greater than regular inflation. But I've also got to account for the fact that money invested today will also earn interest.

> So I've got two factors I've got to balance. One, I've got the increasing costs of inflation and I've also got the rates of return I can get on invested money, but I've got to choose a safe, prudent investment.

(Doc. 453) at 206:18–207:6. Johnson then provided the jury a "simple example of present

value," once again explaining the concept in generalities. *Id.* at 210:22–211:12.

In regards to the discount rate, Johnson testified that it involves comparing "the

difference between the interest rate, called the rate of return, and whatever we're comparing it to,

regular inflation or whether we're comparing it to medical inflation in this case." *Id.* at 213:16–

22. Johnson then testified that the interest rate on United States government bonds is about

4.5%; and the inflation rate is approximately 3.7%. *Id.* at 213:23–214:1. Johnson further

explained that when the rate of return is greater than the inflation rate,

> I can set aside a little bit less and let the compounding effect of interest catch up. That's why it's a negative with the two parentheses around it, eight-tenths of a percent.[3] So whenever we go to compare something in the future, the cost is, we can take what it costs today, and for each year in the future we have to pay that bill we can shrink it by eight-tenths of a percent on a compound annual basis.

*Id.* at 214:1–9. Once more, Johnson testified in generalities.

In light of the aforementioned testimony, and drawing all reasonable inferences in favor

of Plaintiff, the Court finds that the jury's verdict of $1,000,000 in future lost wages is not

---

[3] It is unclear from the record what exhibit or document Johnson referenced in his testimony.

sufficiently supported by the evidence.  At no point did Johnson articulate the requisite present

value formula for earning capacity; nor did Johnson explain how to apply present value for

earning capacity.  *See Wilson*, 1973–NMCA–154 ¶ 15, 518 P.2d at 1218 (expert testimony

detailed computation of present value); *see also Metcalfe v. Atchison, T. & S. F. Ry. Co.*, 491

F.2d 892, 899 (10th Cir. 1974) (actuary computed present value of future contributions).

Moreover, Johnson's discount rate testimony, at best, informed the jury of a type of interest rate

and inflation rate that could be applied.  Johnson did not state, however, whether the United

States government bonds interest rate and the inflation rate would apply to loss earning capacity.

As evidenced by his testimony, the interest rate and inflation rate may change depending on the

damages sought.  *See* (Doc. 453) at 206:6–10, 24–207:1, 211:17–212:7.  Consequently, the Court

finds Plaintiff did not present sufficient evidence at trial for a reasonable jury to reduce A.R.'s

earning capacity to present value as required by UJI Civ. 13-1809.  Therefore, Defendant is

entitled to judgment as a matter of law on Plaintiff's claim for future lost wages.  The Court

further hereby amends the Final Judgment, (Doc. 445), and reduces Plaintiff's award by

$1,000,000.

       *D.  Comparative Negligence and Independent Intervening Cause*

       It is Defendant's position that the sole cause of the accident and A.R.'s injuries was

Andres Rivera's (Rivera) negligence in falling asleep while the vehicle was on, leaving A.R.

unattended and unsupervised.  Defendant claims it was unreasonable for the jury to find Rivera

at anything less than 100% negligent.  Defendant also maintains that the Court erred in granting

summary judgment on its affirmative defense of independent intervening cause.

       As a preliminary matter, Defendant did not properly preserve a Rule 50(b) motion with

respect to the contention that Rivera was 100% comparatively negligent.  In its Rule 50(a)

motion, Defendant asserted that Rivera testified that he was at fault.  (Doc. 455) at 120:19–20.

Defendant further argued,

> There is no contrary evidence, and that—with the no contrary evidence, the
> plaintiff's case is essentially closed.  I would argue that no reasonable jury could
> find that there should not be comparative fault, which is what they would have to
> do.  And therefore, we'd move for a directed verdict on the affirmative defense.
> *Of course, I'm not asking the Court to assess any percentage.*  It's just a matter of
> having the Court find that yes, indeed, there should be comparative fault.

*Id.* at 120:20–121:4 (emphasis added).

Based on the foregoing, the Court finds that Defendant properly raised a preverdict

motion on the sufficiency of the evidence with respect to comparative negligence.  Defendant,

nonetheless, specifically stated that the motion did not pertain to the percentage of liability that

should be allocated to Rivera.  As such, the Court finds that Defendant's Rule 50(b) motion on

the percentage of Rivera's negligence is not proper.  *See Cavanaugh v. Woods Cross City*, 718

F.3d 1244, 1250 n.1 (10th Cir. 2013); *United Int'l Holdings, Inc. v. Wharf Holdings, Ltd.*, 210

F.3d 1207, 1229 (10th Cir. 2000) ("[M]erely moving for directed verdict is not sufficient to

preserve any and all issues that could have been, but were not raised in the directed verdict

motion."); Fed. R. Civ. P. 50(b) advisory committee's note to 2006 amendment  ("Because the

Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds

advanced in the preverdict motion.").

Assuming arguendo that Defendant properly preserved its Rule 50(b) motion, it is

improper for this Court to determine Rivera's negligence.  To prove comparative negligence,

Defendant was required to show Rivera's duty, breach, and causation—including cause in fact

and proximate cause—of A.R.'s injuries.  *See Herrera v. Quality Pontiac*, 2003–NMSC–018 ¶ 6,

73 P.3d 181, 185–86; *see also Scott v. Rizzo*, 1981–NMSC–021 ¶15, 634 P.2d 1234, 1239.  It is

uncontroverted that Rivera, as a parent, owed A.R. a duty of ordinary care.  (Doc. 259) at 2.

Thus, at trial, Defendant had the burden to prove breach and causation.  The issues of breach and proximate cause, however, require a factual inquiry and, hence, cannot be decided as a matter of law.  *Fernandez v. Ford Motor Co.*, 1994–NMCA–063 ¶ 40, 879 P.2d 101, 114; *Trujillo v. Treat*, 1988–NMCA–017 ¶ 8, 752 P.2d 250, 252.  Moreover, this Court may not weigh the evidence or challenge the factual conclusion of the jury that Rivera was thirty percent negligent.  *See Hampton*, 247 F.3d at 1099.  Accordingly, the Court finds judgment as a matter of law is not warranted with respect to Rivera's comparative negligence.  For these reasons, the Court also finds that Defendant is not entitled to a new trial.  Furthermore, the Court finds that it was within the purview of the jury to determine Rivera's comparative negligence and, consequently, the verdict is not clearly erroneous nor does it result in manifest injustice.

Finally, the Court finds Defendant's assertion that the Court erred in granting summary judgment on the affirmative defense of independent intervening cause meritless.  In New Mexico, it is well established that the defense of independent intervening cause has been virtually eliminated in cases involving only the negligence of the parties.  *Silva v. Lovelace Health System, Inc.*, 2014–NMCA–086 ¶ 2, 331 P.3d 958, 960 (citing *Torres v. El Paso Elec. Co.*, 1999–NMSC–029 ¶ 13, 987 P.2d 386 (holding independent intervening cause not apply to plaintiff's negligent acts), *overruled on other grounds by Herrera v. Quality Pontiac*, 2003–NMSC–018 ¶ 33, 73 P.3d 181).  The affirmative defense of independent intervening cause, nevertheless, is available under limited circumstances.  The limited exceptions apply to "intentional or criminal acts or forces of nature that are unforeseeable."  *Id.*  "A force of nature is modern phraseology for what New Mexico's appellate opinions formerly referred to as an Act of God.  Construed in this manner . . . [the New Mexico] Supreme Court has applied the force of nature analysis only to such an extraordinary and unexpected [event] . . . as cannot be prevented

24

by human care, skill or foresight." *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001–NMCA–045 ¶ 24, 27 P.3d 1019, 1024–25 (internal quotations and citations omitted).  In other words, an unforeseeable force of nature is "such a cause as would have produced the injury independent of the defendants' actions." *Trotter v. Callens*, 1976–NMCA–013 ¶ 7, 546 P.2d 867, 869.

Defendant claims that Rivera's action of falling asleep is within the narrow exception because A.R.'s injuries were unforeseeable.  Defendant further maintains that "[a]bsent [Rivera's] negligence, A.R. *likely* never even becomes trapped in the window because Mr. Rivera would have been supervising and attending to A.R."  (Doc. 460) at 22 (emphasis added). Defendant's argument is perplexing in light of the definition of an unforeseeable force of nature. In order for the exception to apply, Rivera's action—falling asleep—must produce A.R.'s injuries independent of the defective actuation of the subject switch.  Significantly, Defendant's motion and the record evidence that it is *likely* or probable that A.R.'s injuries could have resulted from the defective actuation of the subject switch, absent Rivera's negligence.  As a result, the Court is not inclined to find Rivera's actions were such that they produced A.R.'s injuries independent of Defendant's actions.  Accordingly, the Court finds that it did not err in granting summary judgment on the affirmative defense of independent intervening cause. Defendant's Motion is, therefore, denied.

*IV.    Conclusion*

In summary, the Court finds sufficient evidence on the record for a reasonable jury to find the liability assessed in this case.  Thus, judgment as a matter of law would be inappropriate and Defendant's Rule 50(b) motion is denied.  Further, the verdict is supported by the weight of the properly admitted evidence and a new trial is not warranted under Rule 59(a).  The Court also

finds that its rulings regarding the admissibility of Rosenbluth's and Hoffman's testimony were not clearly erroneous and did not result in manifest injustice.  Accordingly, Defendant's alternative motion to alter or amend the judgment under Rule 59(e) is denied.  The Court, however, finds there was no legally sufficient evidence with respect to present value and discount rate in order for a rational jury to find for A.R.'s future lost wages.  Therefore, the Court concludes that Defendant is entitled to judgment as a matter of law as to A.R.'s future lost wages and the judgment shall be reduced accordingly.

IT IS, THEREFORE, ORDERED that Defendant's Combined Rule 50 and Rule 59 Motion (Doc. 460), is denied, in part, and granted, in part.  IT IS FURTHER ORDERED that the Final Judgment (Doc. 445) is amended to set aside the award of $1,000,000 for A.R.'s future lost wages.

_____
UNITED STATES DISTRICT JUDGE